## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **(1) KYLE NICELY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | Case No. <u>CIV-20-36-SLP</u> |
| | ) | |
| **(1) COX ENTERPRISES INC., WELFARE** | ) | **ATTORNEY LIEN CLAIMED** |
| **BENEFITS PLAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Kyle Nicely, for his cause of action against Defendant Cox Enterprises Inc., Welfare Benefits Plan ("Plan"), alleges and states as follows:

### I.      Jurisdiction and Venue

1.      Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq*., to recover benefits due under an employee benefit plan, and to recover costs and attorney's fees.

2.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.   Under 29 U.S.C. § 1132(f), this Court has jurisdiction without regard to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this district pursuant to 29 U.S.C. § 1132(e)(2) and pursuant to 28 U.S.C. § 11391(b), in that a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

### II.      Parties and Plan

4.      Plaintiff is a fifty (50) year-old man.  He resides in Meeker, Oklahoma and

within this judicial district.

5.      At all relevant times, Plaintiff was employed by Cox Communications in Oklahoma City.   Plaintiff last worked as a Field Service Representative III for Cox Communications.

6.      Cox Communications is an operating subsidiary of Cox Enterprises, Inc. ("Cox Enterprises").

7.      Defendant Cox Enterprises Inc., Welfare Benefits Plan (the "Plan") is a welfare benefit plan sponsored by Cox Enterprises.

8.      At all relevant times, Plaintiff was eligible to participate in the Plan, did participate in the Plan, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7).

9.      At all relevant times, the Plan made long term disability ("LTD") benefits available to Plan participants.

10.     LTD benefits payable pursuant to the Plan are self-funded by Cox Enterprises.

11.     The Plan is administered by Cox Enterprises and Cox Enterprises is the named Plan Administrator.

12.      Aetna Life Insurance Company ("Aetna") is the designated claims administrator with respect to LTD claims made pursuant to the Plan.

13.     Aetna serves as the designated claims administrator pursuant to an Administrative Services Contract between Aetna and Cox Enterprises, Contract Number ASC-050398.

14.    By virtue of its status as the claim administrator with respect to LTD claims, Aetna makes the LTD claims benefit decisions.  Aetna does not make payment for LTD benefits due under the Plan out of Aetna's funds or assets.

15.    The Plan does not contain any provision wherein discretion is expressly reserved to, or delegated to, Aetna to determine LTD benefit eligibility or entitlement.

16.    The coverage options for LTD benefits pursuant to the Plan include a monthly benefit rate of 60% or 70% of an eligible participant's annual base salary, subject to certain maximum monthly benefit limitations.

17.    Pursuant to the Plan, a LTD claimant will be considered "totally disabled" when either of the following applies:

- In the first 24-month period of disability, you are not able, solely because of injury or disease, to work at your own occupation.

- After the first 24 months of a period of disability, you cannot work at any reasonable occupation.  (A reasonable occupation is defined as any gainful activity which you are or reasonably could become qualified to perform through education, training or experience earning equal to your LTD benefit but no less than 60% of pre-disability earnings. It does not include work under an approved rehabilitation program.)

18.    For a claimant whose disability begins before age 60, the maximum benefit period pursuant to the Plan is the person's 65th birthday.

### III.    Allegations Applicable to All Claims

19.    Plaintiff began working for Cox Communications in February 2001.

20.    Plaintiff elected LTD coverage that was available to him as a Plan participant.  Plaintiff elected the coverage option that provided for LTD benefits at a monthly benefit rate of 70% of his annual base salary.

21.     Plaintiff ceased working on or about April 17, 2017, as a consequence of his debilitating medical conditions, including spinal impairments, osteoarthritis, fibromyalgia, related chronic pain and weakness, and related restricted range of motion.

22.     Plaintiff's annual rate of pay at the time he last worked was $73,382.40.

23.     For the six-month period immediately following his work cessation, Plaintiff received salary continuation payments from Cox Enterprises.

24.     Because the terms of the Plan include a waiting period of six consecutive months of disability in order to qualify for LTD benefits, Plaintiff did not initiate a LTD claim until October 2017.

25.     On October 3, 2017, Plaintiff submitted a LTD claim to Aetna.

26.     Plaintiff's initial claim submission included information from himself and his employer that confirmed Plaintiff worked as Universal Home Technician and installed and serviced residential cable TV, internet service, telephone, and home security.

27.     Plaintiff's initial claim submission included information from himself and his employer that confirmed the physical exertion requirements of Plaintiff's occupation involved was classified as "heavy."

28.     Plaintiff's initial claim submission included an Attending Physician Statement and Capabilities and Limitations Worksheet completed by Dr. Waddah N. Nassar.  Dr. Nassar endorsed that Plaintiff was "unable to sit, stand, climb, kneel, push, [or] pull" and had "no ability to work." Dr. Nassar endorsed that the duration of Plaintiff's restrictions was "lifetime."

29.     By letter dated October 25, 2017, Aetna approved Plaintiff's LTD claim for payment pursuant to the "own-occupation" definition of disability.  The gross monthly benefit was $4,280.64, which reflected the monthly benefit rate of 70% of Plaintiff's annual base salary.

30.     In its letter dated October 25, 2017, Aetna told Plaintiff as follows:

If we determine that a Social Security Disability Benefit Application is required, we have arranged with ALLSUP Incorporated, a Social Security advocacy firm, to call and assist you with your Social Security application. These services will be provided at no cost.

31.     On October 30, 2017, Aetna conducted an "initial SSDI review."  As reflected in the related Aetna note, "Allsup has deemed this claimant as viable for SSDI."

32.     Consequently, the noted plan of action in the related Aetna note was to "warm transfer the claimant to Allsup's Disability Resource Center."

33.     Aetna subsequently received medical records from Plaintiff's healthcare provider.  The 2017-related medical information and records included:

- A pulmonary function test done on May 11, 2017, confirming a mild obstructive lung defect;

- A lumbar spine x-ray done on May 19, 2017, evidencing multilevel degenerative changes with disc space narrowing, and most pronounced posteriorly off L5-S1, and fact arthrosis most pronounced at L5-S1.

- A cervical spine x-ray done on June 2, 2017, evidencing disc space narrowing and circumferential osteophytic lipping at C5-6 and C6-7, and facet joints exhibiting mild diffuse degenerative change.

- A lumbar spine MRI done on August 29, 2017, evidencing multilevel degenerative disc disease and mild facet arthropathy of the lumbar spine resulting in mild spinal canal stenosis and neuroforaminal narrowing most pronounced on the left at L5-S1.

- A cervical spine MRI done on September 15, 2017, evidencing cervical spondylosis resulting in mild spinal canal stenosis at the C5-C6 and C6-C7 levels, and moderate to severe neuroforaminal stenosis on the right at C3-C4 and bilaterally at C5-C6 and C6-C7.

- Treatment notes evidencing Plaintiff's consistent reporting neck, back, shoulder and joint pain, and abnormal findings on physical examination.

- Pain management records evidencing that Plaintiff underwent a lumbar spine epidural steroid injection at the L2-3 level on November 8, 2017.

34.     Upon receipt and review of the 2017-related medical information and records, Aetna continued to approve Plaintiff's LTD claim for payment.

35.     Pursuant to Aetna's request for updated medical records, Plaintiff submitted his office visit notes from encounters with Dr. Nassar during the period January through April 2018.  The records confirmed Plaintiff's continued pain, abnormal findings on physical examination, and pain management treatment.  The records specifically refer to an emergency room visit due to Plaintiff's severe back pain and another epidural steroid injection.

36.     Upon receipt and review of the 2018-related medical information and records, Aetna continued to approve Plaintiff's LTD claim for payment.

37.     By letter dated April 27, 2018, Aetna requested that another Attending Physician Statement and Capabilities and Limitations Worksheet be completed and returned.

38.     Dr. Nassar completed the Attending Physician Statement on June 5, 2018. Dr. Nassar endorsed that Plaintiff's primary diagnosis was "cervical spondylosis/lumbar

spine". The secondary diagnosis was "facet joint pain" and the other noted diagnosis was "neck pain."

39.     Dr. Nassar confirmed that Plaintiff's symptoms were "numbness, burning nerve pain, chronic back pain, incontinence, anxiety, depression, joint stiffness and pain & headaches."

40.     Dr. Nassar again endorsed that Plaintiff had "no ability to work."

41.     Dr. Nassar's encounter note for May 14, 2018 was also submitted to Aetna. Dr. Nassar recorded the following in the "chief complaint" section:

> The patient is in today for reevaluation of his back and neck pain. He continued to have significant symptoms. The pain medication helps some. Specifically sitting for 2 hours or more will produce moderate to severe pain in the lower lumbar area and will make him experience neuropathic electric shock type pain in the lower extremities.
>
> Standing for 10 minutes or more can cause also (sic) pain down into the hips and knees it can get to the point that makes him have to sit down or sit on the floor. Also associated with neurological symptoms in the lower extremities.
>
> Walking activities is variable and he can tolerate walking for a good distances (sic) at times and then other times he cannot. And sometimes the symptoms recurs after walking for no more than 10 or 15 minutes.
>
> Regarding the neck pain rotation of the cervical spine can be causing him a lot of headaches and hyper extension for several times would also do the same (sic). And that the (sic) headache can be quite significant and excruciating that decreases ability to function for up to several hours at times.
>
> Based on the above he learned to limit his activities to less than 2 hours and maximum and he has always to find a place where he can't sit or rest (sic). Discussed pain medication has been effective which includes morphine 15 mg to be taken every 6 hours as needed less followed by his his (sic) pain management specialist.

42.     Upon receipt and review of the updated Attending Physician Statement from

Dr. Nassar and the May 14, 2018 note, Aetna continued to approve Plaintiff's LTD claim for payment.

43.     By letter dated August 2, 2018, Aetna notified Plaintiff that it was reviewing his claim pursuant to an impending "change in the definition of disability." Aetna advised it would be evaluating Plaintiff's ability to perform other occupations.

44.     As part of Aetna's "early" any-occupation assessment, it conducted a telephone interview with Plaintiff on October 8, 2018.  Plaintiff advised Aetna that he had undergone a fusion surgery on October 4, 2018.

45.     Aetna did not pursue medical records regarding fusion surgery.

46.     On February 18, 2019, as part of the transition investigation, the assigned Aetna claim representative referred Plaintiff's claim to an Aetna vocational resource for an "OccuSkillAssessment."  The  accompanying referral comment was:

> [Plaintiff] has knowledge and ability to use a computer, can do emails, etc and types per [work history]. If the [Plaintiff] had [full time sedentary physical demand level] ability with ability to change positions as needed from sit/stand/walk would [Plaintiff] have the skills for [reasonable wage sedentary] employment?

47.     On February 20, 2019, the Aetna vocational resource responded to the referral.   The  vocational  specialist  said  "No."   She  endorsed  that  Plaintiff  had  no transferable skills to alternate occupations and explained as follows:

> EE does not appear to have sedentary skills for alternative occupations within the sedentary [physical demand level] with potential to reach the reasonable wage criteria of 25.29 within the National Labor Market.

48.     On March 29, 2019, Dr. Nassar responded to a request to complete another Attending Physician Statement.  Dr. Nassar endorsed that Plaintiff's primary diagnosis was

"cervical spondylosis".  The secondary diagnosis was "facet joint pain" and the other noted diagnoses were "neck pain, right shoulder pain."

49.     Dr. Nassar endorsed that "[patient] is unable to work and has been disabled due to noted diagnoses." Dr. Nassar further commented that Plaintiff was not able to pass a physical, his mental status was altered because the constant pain and use of narcotic pain medications, and that it "would be near impossible for [patient] to maintain stable and ongoing employment."

50.     Dr. Nassar again endorsed that Plaintiff had "no ability to work."

51.     On March 31, 2019, the assigned Aetna claim representative determined that a "clinical consultant review" was needed.

52.     On April 8, 2019, an Aetna-employed registered nurse, Roxanne Dunham, performed the "clinical consultant review."

53.     Nurse Dunham never treated or examined Plaintiff.

54.     Nurse Dunham reviewed the claim file and opined that "[g]iven subjective [complaints of] back pain, imaging findings of degenerative changes, he is likely restricted to lifting no more than 35 lbs. on occasional basis. Information does not support further [restrictions or limitations]."

55.     Nurse Dunham did not contact Plaintiff's treating healthcare provider, Dr. Nassar, to discuss Dr. Nassar's contrary opinions.

56.     In her review of the file, Nurse Dunham also noted that certain medical records were or might be missing.  Nurse Dunham said "[r]ecords are needed regarding his reported spine fracture-exam and diagnostic testing. Note there are no spine surgery

records." She added "[t]here are no pain management records and these should be obtained for the file."

57.     The next day, on April 9, 2019, the assigned Aetna claim representative referred Plaintiff's claim to an Aetna vocational resource for a "TransReview."   The referral instruction was to perform a transferable skill analysis ("TSA") and labor market analysis based on the conclusion of Nurse Dunham that Plaintiff could work at the light physical demand level.

58.     The Aetna vocational resource responded to the referral a few hours later. The vocational specialist's conclusion was three occupations meet all required criteria, including reasonable wage, education, experience, training and functional capacity within Plaintiff's labor market.

59.     According to the Aetna vocational resource, the three "light" physical demand level occupations Plaintiff could purportedly perform were Body Wirer, Electric Meter Installer, and Trouble Shooter I.

60.     Three days later, by letter dated April 12, 2019, Aetna notified Plaintiff that LTD benefits would cease effective April 5, 2019 because he was not totally disabled from performing any reasonable occupation for which he was qualified by education, training or experience.

61.     Aetna denied Plaintiff's claim without first seeking to obtain and review the missing information and records noted by Nurse Dunham in her "clinical review."

62.     On or about June 27, 2019, Aetna learned that Plaintiff had been awarded SSDI benefits.

63.     Plaintiff appealed Aetna's decision by letter dated July 12, 2019, and submitted additional information and medical records in support of his claim.  Plaintiff submitted treatment records from (1) Dr. Timothy Puckett, orthopedic surgeon, (2) Dr. William Schnitz, rheumatologist, (3) Dr. Marguerite Butchee, neurologist, and (4) Dr. Fadi Nasr, neurosurgeon.

64.     The medical records from Drs. Puckett, Schnitz, Butchee and Nasr evidenced and confirmed Plaintiff's consistent and repeated attempts to obtain relief from his chronic and significant back, neck and shoulder pain, including a C5-C6, C6-C7 anterior cervical discectomy and fusion and strong pain medications.

65.     On July 22, 2019, the assigned Aetna appeal's representative spoke with Plaintiff by telephone.  In discussing Plaintiff's issues, the representative noted Plaintiff's remarks as "still spine always an issue, it will never be fixed. Has fibromyalgia and can't get numbness and pain out of hands, can't grasp and hold onto things, and has dizzy spells . . . . Still having bad migraines."

66.     By letter dated July 24, 2019, Aetna advised Plaintiff that, in view of new information he wished to submit on appeal, he should submit such within 30 days and Aetna would begin its review on August 24, 2019.

67.     On or about July 29, 2019, Aetna determined to request "peer reviews" on Plaintiff's LTD claim from doctors whose specialty were neurology and internal medicine. It requested the peer reviews from Reliable Review Services ("RRS").

68.     In furtherance of the requested peer reviews, Aetna provided claim file documents and records to RRS.

69.     Aetna did not provide RRS with any document or record reflecting that Plaintiff awarded SSDI benefits in 2019.

70.     Aetna did not request Plaintiff's SSDI claim file from the Social Security Administration for consideration on Plaintiff's LTD claim appeal.

71.     Dr. Neil Gupta conducted the requested internal medicine file review and produced a report.  Aetna received Dr. Gupta's report on August 14, 2019.

72.     Dr. Gupta emphasized that his review was from an internal medicine perspective only.  Dr. Gupta answered the referral questions.  In so doing, Dr. Gupta opined that "the documentation does not support impairment from an Internal Medicine standpoint" and "[t]he claimant has sustained functional capacity (8 hours a day 5 days a week) from an Internal Medicine standpoint."

73.     Dr. Gupta never treated or examined Plaintiff.

74.     Dr. Steven Graham conducted the requested neurology file review and produced a report.  Aetna received Dr. Graham's report on August 14, 2019.

75.     Dr. Graham emphasized that his review was from a neurology perspective only.  Dr. Graham answered the referral questions.  In so doing, Dr. Graham opined that "no specific neurological exam abnormalities were documented which would translate into any specific physical restrictions or limitations from 4/16/19 to the present."

76.     Dr. Graham carefully addressed and distinguished Plaintiff's spinal impairments and pain.  Dr. Graham conceded that "[m]edical records note chronic complaints of spinal pain for many years, however, not associated with any specific documented neurological exam deficits."

77.    Dr. Graham also stated "it appears that [Plaintiff's] subjective complaints of pain would be the most prominent self-limiting condition in regards to physical capacity." Dr. Graham further acknowledged that "the subjective nature of the pain and self-limiting behaviors can negatively impact overall functional capacity . . . ."

78.    Dr. Graham never treated or examined Plaintiff.

79.    Drs. Gupta and Graham are not orthopedic doctors or neurosurgeons. Neither are pain management doctors or have a pain subspecialty in their respective practice areas.

80.    Drs. Gupta and Graham were not the most appropriate trained and experienced doctors to consider the principal field of medicine involved in Plaintiff's claim, i.e., spinal impairments and related chronic pain.

81.    Following receipt of Drs. Gupta and Graham's reports, Aetna determined that the TSA done on April 9, 2019 was still valid.

82.    Aetna's reliance of the vocational analysis done on April 9, 2019 over the contrary vocational analysis done on February 20, 2019 evidences the Plan's unreasonable and unprincipled review.

83.    Aetna determined to render an appeal decision based on the reports provided by Drs. Gupta and Graham. Consequently, Aetna notified Plaintiff of its final claim decision by letter dated August 27, 2019.  The denial rationale stated therein substantially tracks the views expressed by Drs. Gupta and Graham pursuant to their respective file reviews.

84.     At or about the time Aetna was issuing its appeal decision letter, Plaintiff submitted a copy of the SSA's *Notice of Decision – Partially Favorable* to Aetna.   In pertinent part, the *Notice of Decision* evidences that the SSA found Plaintiff to have the following severe impairments:  degenerative disc disease, chronic pulmonary disease, and osteoarthritis.

85.     The SSA's *Notice of Decision* evidences that beginning April 21, 2019 and thereafter, Plaintiff had no transferable job skills to other occupations and that Plaintiff was disabled under the SSA's rules effective April 21, 2019.

86.     By letter dated August 29, 2019, Aetna advised it wouldn't consider the SSA information submitted because a final decision had been made on August 27.

87.     Aetna failed to gather and examine material records and information that militated in favor of a claim approval.  In particular, although advised by Plaintiff and Allsup that Plaintiff had been approved for SSDI benefits, Aetna made no effort to obtain and review the SSDI claim file before finally denying Plaintiff's LTD claim appeal.

88.     Aetna's failure to request or review Plaintiff's SSDI claim evidences the Plan's unreasonable and unprincipled review.

89.     Aetna did not request Plaintiff to undergo an independent medical examination ("IME") or functional capacity evaluation ("FCE") before finally denying his LTD claim.

90.     Aetna's failure to request an IME or FCE under the circumstances of Plaintiff's claim evidences the Plan's unreasonable and unprincipled review.

91.    In denying Plaintiff's LTD claim beyond April 5, 2019, the Plan, through the actions and decisions of Aetna, conducted a skewed and self-interested investigation and evaluation of Plaintiff's claim, failed to apply the terms of the applicable Plan to Plaintiff's claim, mischaracterized record information and cherry-picked record information which might lend support to a claim denial while de-emphasizing or disregarding record information supportive of Plaintiff's claim, and unreasonably relied on an unqualified nurse and/or inappropriately qualified file-reviewing physician consultants.

92.    Plaintiff has exhausted his administrative remedies.

## IV.    Statement of Claims

### First Claim
### ERISA – Improper Denial of Benefits

93.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 92 of this Complaint as though set forth at length herein and further alleges:

94.    At all relevant times the terms of the Plan required payment of LTD benefits to Plaintiff due to his debilitating conditions.

95.    The Plan's failure to approve "any-occupation" disability benefits to Plaintiff beyond April 5, 2019 is contrary to the terms of the Plan, and is wrong, unreasonable, and not supported by the substantial record evidence.

96.    Plaintiff seeks a declaration from this Court that he is entitled to the LTD benefits due him under the terms of the Plan, in the amounts and for the duration consistent

with the terms of the Plan, and an Order that all future disability benefits should be paid pursuant to the terms of the Plan.

97.     Alternatively, Plaintiff seeks a declaration from this Court that the Plan's adverse claim decision is not the product of a full and fair review and he further seeks a related Order, therefore, reinstating his LTD claim and remanding the matter to the Plan for a full and fair review.

98.     By reason of the Plan's wrong, incorrect, unreasonable, and/or arbitrary and capricious claim decision, Plaintiff has been forced to retain an attorney to secure the LTD benefits due him under the terms of the Plan, for which Plaintiff has and will incur attorney fees and costs.

99.     Plaintiff is entitled to recover the reasonable attorney fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Plaintiff Kyle Nicely demands judgment against Defendant Cox Enterprises Inc., Welfare Benefits Plan, as follows:

(1)     for a declaration that the Plan improperly terminated his LTD claim, and that he is entitled to receive the amount of benefits due under the terms of the LTD Plan that have not been paid, together with prejudgment and post-judgment interest thereon;

(2)     for a declaration that all future LTD benefits be paid pursuant to the terms of the Plan; or for a declaration that the Plan denied Plaintiff a full and fair review, and that as a consequence thereof, his LTD claim should be reinstated and remanded for further claims procedures;

(3)     for the costs of this action, and Plaintiff's attorney fees pursuant to 29 U.S.C.

§ 1132(g); and

(4)     for such other and further relief as may be deemed just and proper by the

Court.

**Respectfully submitted,**

**SHOOK & JOHNSON, P.L.L.C.**

**By:**     **s/ Jonathan E. Shook**
           **Jonathan E. Shook, OBA #17343**
           **7420 S. Yale Avenue**
           **Tulsa, OK 74136**
           **Telephone:  (918) 293-1122**
           **Facsimile:   (918) 293-1133**
           **jshook@shookjohnson.com**

**ATTORNEY FOR PLAINTIFF**